UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | |
|---|---|
| RICHARD CLAY MIHLFELD, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. |
| ) | 3:13-CV-00556-HSM-HBG |
| vs. ) | |
| ) | |
| CAROLYN W. COLVIN, ACTING ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFF'S OBJECTION AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff files this Objection and Response to Defendant's Motion for Summary Judgment. Plaintiff previously filed a Motion For Summary Judgment and Memorandum Brief in Support pursuant to Rule 56, Federal Rules of Civil Procedure, and Defendant has filed a partially responsive Motion For Summary Judgment and Memorandum. Defendant has thus waived argument as to those points raised by Plaintiff in his opening Brief, to which Defendant has failed to respond. Plaintiff is entitled to judgment in this case based upon all of the facts set forth in the record of this action.

Plaintiff had no health insurance during all times relevant to this action R., p., 37. Generally, the Defendant imposes upon claimants for disability benefits an obligation to produce records which support a claim for such benefits. The obligation is easier to satisfy, particularly the acquisition of medical care and treatment, when a claimant has such insurance. Although it is under no obligation to do so, the Defendant does not

provide medical care and treatment to claimant's who do not have health insurance, but the Defendant's Regulations do not acknowledge or otherwise address the difficulties faced by claimants who, for whatever reason, do not have health insurance coverage, which would provide evidentiary support for their respective claims.

Upon his admission to the hospital in July 2009 after he sustained severe orthopedic injuries, the Plaintiff was operated on and followed by Dr. Steven Smith, a board certified orthopedic surgeon with University Orthopedic Surgeons. No doubt, Dr. Smith was summoned to the emergency room, and ultimately, sufficient medical care and treatment were provided to Plaintiff so that he could at least minimally function, irrespective of his ability to work. But, at the time he left Dr. Smith's care, the Plaintiff reverted to the status of having no health insurance to cover residual difficulties he experienced from his injuries.

This recitation is not provided in an attempt to improperly submit marginally relevant information in support of Plaintiff's claim or to otherwise seek to improperly argue the case, but to explain any evidentiary gaps in the record.

One issue in this action is whether the Plaintiff sustained the inability to ambulate effectively, per Listing 1.06 of the Defendant's Regulations, after the alleged onset date of disability, and if he lost the ability to ambulate effectively, when did that loss occur? And ultimately, did Plaintiff regain the ability to ambulate effectively and when did that occur? The answer to these questions depends largely upon the alleged date of onset of the disability. Both the medical and non-medical evidence of Plaintiff's ability to ambulate effectively meets the preponderance standard, but the medical evidence would conceivably be stronger if Plaintiff had health insurance.

Plaintiff initially alleged that his onset date was March 15, 2010, R., p. 131, and not the date of his accident in July 2009 because, as he testified in his hearing before the Administrative Law Judge ("ALJ"), he had attempted to work after his July 2009 motorcycle accident. R. p. 32. Surprisingly, the ALJ unilaterally amended the onset date to the date of the accident, July 20, 2009, based upon the finding that the work activity thereafter did not amount to substantial gainful activity. R., p. 14. The ALJ, however, denied the claim for disability benefits.

Plaintiff was given no detailed explanation for the basis for the ALJ's findings regarding "substantial gainful activity". The ALJ did not seek Plaintiff's agreement or acquiescence to the amended onset date prior to the date of the decision. Plaintiff was given no no notice of any kind that the alleged onset date would be changed.

Plaintiff does not agree with the ALJ's statement in the decision that undersigned "asserted" during the hearing that the proper alleged onset date is July 20, 2009, because the statement is inconsistent with the hearing transcript. R., p.32. [1]/

Plaintiff does not, nonetheless challenge the amendment for the sole reason that the effect of the change would most likely increase the amount of back benefits.

---

[1] / The ALJ asked of undersigned the alleged onset date and the response was as follows: "***July 20 of 2009. I did not check with the file, your honor. I'm assuming that that's the onset date since it's the day after the accident***." *id.* This statement could not reasonably be characterized as an assertion by undersigned and was at most an equivocal statement as to the onset date. Plaintiff did not seek any amendment of the onset date.

3

## LISTED IMPAIRMENT

The Defendant has failed to address the salient fact that there is a total absence in the record of any evidence that Plaintiff's fractured pelvis has achieved "solid union". The hard fact that this evidence is absent from the record establishes an important element of Listing 1.06. Plaintiff relies on the evidence of record.

Your Defendant contends that radiographic evidence of anatomic appearing posterior pelvis; lack of change to iliosacral screws; anatomic appearing symphasis with intact plate, along with apparent fair ambulation and no significant limp; smooth hip motion; apparent lack of pelvic instability, rebuts the clinical evidence (Brief, p. 12) but this argument cannot withstand scrutiny.

The Defendant relies upon Dr. Smith's opinion of September 10, 2009, which was a mere six weeks after the Plaintiff's hospitalization for his injuries of July 16, 2009 (Record, p. 297). This evidence can only be reasonably viewed in this context and within the context that there was no solid union of the fractured pelvis on that or any other date.

The uncontroverted and undisputed clinical evidence before this Court shows pelvic fracture ( " . . . travers[ing] the right sacrum in the sagittal plane[; d]iastases of the sacroiliac joints[; and d]iastases of the pubic symphysis . . .") on July 16, 2009 (R., p. 269, referenced at p. 2 of Plaintiff's initial Brief), and "posttraumatic and postsurgical changes involving the bony pelvis and right sacroiliac joint [, *e.g*.,] diastasis of the pubic symphysis which is felt to be posttraumatic." R., p. 405 – 406. This uncontroverted evidence demonstrates the longitudinal perspective of the Plaintiff's medically determinable impairment <u>with the absence of solid union</u>. *See e.g*., Listing 1.00H 1: (longitudinal clinical record is generally important for the assessment of severity and expected

4

duration of an impairment unless the claim can be decided favorably on the basis of the current evidence).

Dr. Smith evidently viewed no radiological evidence showing such solid union, and his opinion must be viewed in this context.

The Plaintiff has directed this Court to the evidence which shows whether or not the pelvis achieved solid union and the evidence, plainly, does not show it. Nonetheless, the Defendant, during its processing of Plaintiff's claim for benefits, failed to consider this impairment at the third step of the sequential evaluation even though there was sufficient evidence before the ALJ to so warrant its consideration. The ALJ certainly had page 269 of the Record during consideration of the claim, and the Appeals Council had pages 405 – 406 of the Record. Thus, harmful error occurred to Plaintiff by the Defendant's failure to properly consider this evidence at Step 3 of the Defendant's Sequential Evaluation process.

### **PLAINTIFF FAILED TO RETURN TO EFFECTIVE AMBULATION.**

In regard to Listing 1.06 as it pertains to "effective ambulation", the applicable standard is found in the Defendant's Listing:

> **We will determine whether an individual can ambulate effectively . . . based on the medical** *and* <u>*other*</u> *evidence* **in the case record, generally** *without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c*.

**Listing 1.00B2a** (*emphasis supplied*)**.**

5

The "examples" referred to in the listing are as follows:

> . . . the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*See id.*

The Defendant presently argues, Defendant's Brief, at pp. 8 – 10, that the examples cited above are the sole evidence which must be shown in order to prove an inability to effectively ambulate, and further, that only an "acceptable medical source of evidence", a licensed medical doctor, can give effect to the evidence by issuing a prescription for an assistive device. The burden, it is clear to see, is not this demanding. The Defendant further contends that the prescription for a walker signed by Theresa Thayer, a Nurse Practitioner with the Blount County Health Department (R., p. 359) falls short in establishing "ineffective ambulation" because she is not an "acceptable source of medical evidence" in that she is not a licensed medical doctor. This contention likewise is inaccurate under the governing standard.

The Defendant's own Regulations state that it will consider "medical and other evidence in the case record" in determining whether there is ineffective ambulation without developing additional evidence about the individual's ability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the

6

inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

The import of the Regulation is that the determination of "ineffective ambulation" is not dependent upon evidence which is categorically "medical" by nature as is argued by the Defendant. Non-medical evidence is to be considered along with medical evidence. And even more to the point, the Defendant's Regulations state that generally, it will not "develop" additional evidence pertaining to the "examples", which the Defendant has argued are required evidence of "ineffective ambulation". The operative Rule, therefore completely and thoroughly rebuts the Defendant's contentions in its Memorandum Brief.

Thus, the following evidence of record establishes that the Plaintiff could not ambulate effectively after the onset date, July 20, 2009:

The Plaintiff has back, shoulder, stomach and leg pains constantly, R., p. 95.

He has pain and weakness in his lower extremities and has side effects from his pain medication. He spends his days watching movies, making an effort to fix his own meals, and sitting at the service station. He does not care for animals or other people, but prior to the injuries he sustained in the July 2009 motorcycle accident, he did missionary work, helped others, mowed lawns and rode mountain bikes, none of which he can do at present. He cannot sleep if he is tired and hurting. This occurs every night. Medication can help him to sleep but it has deleterious side effects. It is difficult for him to dress, bathe, care for his hair, shave, feed himself and use the toilet due to his back and leg pain. He tries to fix his own meals by using a microwave oven. He eats when he is hungry but fixing meals is a slow process whereas prior to his injuries, it was not difficult for him to

do. He does no chores, house or yard work because of the pain symptoms in his lower extremities and back restrict his movement. He limits his driving because of these symptoms and their effect on his ability to function. He shops once a week at the grocery store for food and necessities but rarely goes shopping for clothing. Currently, he has no hobbies or interests but he used to be able to hunt and fish. He sits at the service station and goes to church when he can, but this is not regular. What he regularly does is go to bed at night in his camper. In regard to social activities, he doesn't get out much. His back and lower extremity pain affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate and follow instructions. He is right handed and can walk a quarter mile before needing to rest for about 10 - 15 minutes. He can pay attention indefinitely if he is not on pain medication. He does not handle stress well. He fears falling and not being able to get back up. Medication that he takes, morphine, a pain patch, trazodone, and Oxycodone, cause loss of concentration and nausea, overwhelming sleepiness, and drowsiness, respectively. R., pp. 195 – 203.

Dr. Stimpson's office treatment records for 8/20/10 show leg pain and decreased range of motion, R., p. 362; office notes for 10/5/10 show "feet and leg pain", R., p. 363; office notes for 10/18/10 and 01/16/10 reflect "feet hurt all the time[;] feels like pouring acid on them[;] pain in groin area[;] leg cramps worse and frequently in the right foot[;] "feet burn X 1 yr. feet have decrease in sensation on the left, R., p. 364; office notes for 10/20/10, 11/22/10, and 11/21/10 were followup visits for chronic pain management, R., p. 365.

Pain symptoms from exertional activity keep Plaintiff from sleeping; he is not able to take care of household chores like he used to, and he gets assistance for these

8

activities. Plaintiff cannot perform these activities effectively because "his lower body gives out". When Plaintiff shops, he is "in and out". He is not able to pay bills because "he doesn't have money". Plaintiff has difficulty when going places with others because "It takes extra time when he goes with you . . . He can't keep up". His medical conditions affect his abilities to lift, squat, bend, stand, walk, sit, kneel, climb stairs and concentrate. Plaintiff fears falling and uses "all the hand holds he can". R., pp. 187 - 194. This Court must conclude, based upon the foregoing, that Plaintiff could not effectively ambulate after his July 20, 2009, onset date.

The medical treatment records in this action also demonstrate that the claimant could not effectively ambulate. The evidence in these records is referenced and otherwise discussed at pages 4 – 7 in Plaintiff's Initial Brief.

Even Dr. Misra, a non-treating consultative physician who has a contract with the Defendant, credited the pain symptoms, stating, "The patient has chronic pain from a car accident two years ago, mainly in his right hip." R., p. 326.

All of the foregoing evidence supports the conclusion that Plaintiff's inability to effectively ambulate has continued at least past 03/15/2010 and continues to the present.

### DURATIONAL REQUIREMENT

Listing 1.06 requires that return to effective ambulation did not occur within 12 months of onset.

Teddy Davis' statement, R., pp. 187 – 194, supports a conclusion that effective ambulation has not been regained, based upon Davis' familiarity with Plaintiff for three years. Plaintiff's statements in the Function report, R. pp. 195 – 203, are likewise supportive, since the statements are dated 11-22-10. Plaintiff's testimony at the hearing

9

of 06/04/12 are supportive of the lack of a return to effective ambulation, R., pp. 33 – 35, 38 – 39.

The facts show that the Plaintiff attempted to work after the onset date and during the period of time that he was being followed by Dr. Smith. The Court can justifiably assume that the date on which Plaintiff could not effectively ambulate started when Plaintiff initially alleged that he became disabled, March 15, 2010, based upon the ALJ's finding that any work activity prior to that date did not constitute substantial gainful activity. The record is silent as to difficulties, if any, Plaintiff experienced during his attempts to work after July 20, 2009, and thereafter.

In any event, Plaintiff last saw Dr. Smith on 09/10/09 (R., p. 294) and next saw a medical treatment source, Dr. Stimpson, on 01/16/10 (R., p. 307), during which visit, he complained that his "feet hurt all the time[;] feels like pouring acid on them", and pain in the groin area, leg cramps, worse and more frequently in the right foot. The Plaintiff complained that his feet had a burning sensation for a year with loss of sensation and inflammation on the left. *id.* Dr. Stimpson's treatment records were referred to in Plaintiff's initial Brief, at p. 7, but the 01/16/10 visit with Dr. Stimpson show symptoms indicative of an inability to effectively ambulate six months after the onset date. Dr. Misra's report supports a finding that effective ambulation has not been regained Surely, Plaintiff's hearing testimony, referred to at p. 6 of Plaintiff's initial Brief, support the fact that effective ambulation has not been regained.

10

## THE CT SCAN REPORT OF FEBRUARY 8, 2013

The Defendant has grossly mis-read and misinterpreted the significance of the February 8, 2013, CT scan which was submitted to the Appeals Council by the Plaintiff. In his opening brief, at p. 4, Plaintiff refers to this radiological evidence as "clinical evidence of the absence of solid union of the pelvic fracture" and stating that this evidence " . . . would have legitimately warranted a remand from the Appeals Council to the hearing office for consideration of evidence of lack of solid union of the pelvic fracture." The Defendant has not responded to this specific argument and has therefore waived it.

The "remand" to which Plaintiff referred was from the Appeals Council to the hearing office during the administrative processing of this claim, which should have occurred and did not, and was not, as the Defendant has misconstrued in its Memorandum Brief, a reference to a prospective remand from this Court to the Defendant agency.

The contents of the report of the February 2013 CT Scan (R., pp. 405 – 406) are similar in nature to the contents of the report of the CT Scan of July 16, 2009 (R., p. 269). Both show the absence of solid union of the fractured pelvis. Surely the longitudinal perspective established by the CT scan report would have warranted the intra-agency remand.

Your Defendant claims that Plaintiff argues that the additional CT Scan evidence of a hernia warrants a remand by the Court to the agency in order to consider the hernia evidence at step 2 of the sequential evaluation. Again, the "remand" to which Plaintiff

11

referred was from the Appeals Council to the hearing office during the administrative processing of this claim by the agency, which should have occurred and did not and about which he complains, and was not, as the Defendant has misconstrued, a reference to a prospective remand from this Court to the Defendant agency.

Based upon its misunderstanding, the Defendant launched into a three-page discourse of the law pertaining to court remands to the Defendant agency, which may at some point in time have applicability to this action but not at the present time. The Defendant thus failed to respond to Plaintiff's argument that the Appeals Council failed to properly remand the claim to the hearing office based upon all of the contents of the February 2013 CT Scan report, and has therefore waived any such argument.

The Appeals Council was properly sent the CT scan report by the Plaintiff, inasmuch as it considers any "new" evidence submitted by claimants whose claims are denied at the hearing office stage. Record, p. 10.

### INGUINAL HERNIA DEFECT

Your Defendant claims that the Plaintiff's hernia condition is not severe based upon Dr. Misra's placing of no lifting restrictions relative to the condition. The Defendant is presently precluded from asserting this argument because the ALJ made no reference in any fashion to this impairment in the decision. The Defendant is precluded at this juncture from attempting to justify the failures of the ALJ to refer to this hernia condition within the decision, and to make the determination that the condition is or is not severe. The ALJ simply failed to completely consider the record of impairments in their entirety before making the decision in this case. The Plaintiff complained about the

12

hernia (R., pp. 206 – 210); Dr. Misra found the condition (R., p. 325); and the Appeals Council was alerted to the condition and that it was protruding into the bladder (R., pp. 405 – 406).

## *POST HOC* RATIONALIZATIONS

The ALJ had sufficient evidence before him to list the inguinal hernia condition as an impairment and to make a finding as to whether or not it was severe. Likewise, the Appeals Council should have remanded to the claim to the hearing office for these determinations. Instead, the Defendant gave no consideration whatsoever to it. For the Defendant to presently come forward and attempt to administratively assess the hernia condition is simply not proper. The assessment which the Defendant presently purports to make in its Memorandum Brief is an action which it should have done during its administrative processing of Mr. Mihlfeld's claim for benefits and not at this time. This Court's function is to determine whether the Defendant based its decision on the substantial evidence of record, -- not to permit the Defendant to engage in *post hoc* rationalizations for its failure to properly handle a claim at the administrative level.

The Defendant's present arguments are a tacit admission that it failed to properly determine the claim, particularly in reference to the hernia condition, based upon the substantial evidence of record. Had the Defendant properly handled the hernia impairment at the administrative stage, either for or against the Plaintiff, there would be no need for the Defendant to engage in the analyses found at pages 4 – 7, 13 – 16.

The Defendant's present analyses are superfluous; they are actions which the ALJ should have taken prior to the decision. By arguing at this time, and for the first time,

13

that the hernia condition was not severe, Defendant is asking this Court to make a determination that the Defendant would have found the hernia condition as not severe had it properly considered the condition at the administrative stage. Furthermore, the Defendant is attempting to place itself in the mind or thinking process of an ostensibly "independent" adjudicator, the Administrative Law Judge, and is asking this Court to do likewise. It is nothing but speculation for the Defendant to presume what decision the ALJ would have made had the hernia condition been properly assessed during the administrative stage. This Court must decide whether the decision to deny benefits was based upon the substantial evidence of record and not to speculate on actions the adjudicator would have taken.

In any event, the current record shows that the hernia condition had deteriorated by the February 8, 2013, CT Scan, subsequent to which the report was submitted to the Appeals Council. By that date, according to the report, the bladder extended into the hernia opening, R., pp. 405 – 406. The deterioration of this condition should have, but did not, provided impetus to the remand of the claim to the ALJ for a further evaluation of any functional limitations which resulted from the deterioration. The upshot of this is that the ALJ should have, in the decision, identified the hernia condition as an impairment and then determined whether it was or was not severe. In failing to take these steps, the Defendant effectively tied the hands of this Court, preventing it from determining whether substantial evidence supports the decision to deny benefits.

**CONCLUSION**

Based upon the foregoing, the Court should order that this matter be REMANDED to the Agency so that compliance with the applicable law be had or otherwise find that the Plaintiff is disabled as provided in the Defendant's governing regulations.

Respectfully Submitted,

/s/*Stephen T. Hyder*_____
**STEPHEN T. HYDER**
**Attorney at Law (BPR No. 015325)**
**846 West Lamar Alexander Parkway**
**P.O. Box 5389**
**Maryville, Tennessee 37802-5389**
**Phone: 865 977 4454**
**Facsimile: 865 977 7454**

Certificate of Service

I do hereby certify that on March 25, 2014, a copy of the forgoing Plaintiff's Objection and Response To Defendant's Motion For Summary Judgment was electronically filed with the Court's Electronic Filing System, and such will be sent by way of such system to each representative of the Defendant who is designated to receive said filing as indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/ *Stephen T. Hyder*_____
**STEPHEN T. HYDER**